# Shields *v.* Kimbrough & Purnell.

*Bill in Equity between Mortgagees, for Account, etc.*

1. *Contract for cultivation of crops on shares.*—A contract between the lessee of lands and his laborers, for the cultivation of the land on shares, did not, prior to the passage of the act approved February 9th, 1877 (Code, §§ 3474-78), create the relation of landlord and tenant between them, nor give the lessee any lien on the crops for advances made by him to the laborers during the year.

2. *Liability of first mortgagee to second, on account.*—As between the first mortgagee and a second mortgagee of a part of the same property, the former is required to exercise good faith and reasonable diligence in the assertion and enforcement of his rights; but he will not be charged in equity, at the suit of the latter, with the value of property covered by his mortgage, which was lost, destroyed, or removed beyond his reach, by the act of the mortgagor, without fraud or gross negligence on his part.

APPEAL from the Chancery Court of Wilcox.

Heard before the Hon. CHARLES TURNER.

The bill in this case was filed on the 28th January, 1871, by Kimbrough & Purnell as partners, and assignees and own- ers of a mortgage executed by J. T. Thigpen to John J. For- niss, against the said Thigpen, W. B. Shields, and Milhous & Shields ; and prayed a foreclosure of said mortgage, an ac- counting with said Milhous & Shields; who had possession of the mortgaged property, claiming a prior mortgage on it; and for general relief. The material facts of the case are stated in the opinion of the court, The appeal is sued out by W. B. Shields, as surviving partner of the firm of Milhous & Shields, and the final decree of the chancellor is assigned as error, with his specific instructions to the register as to the statement of the account.

JOHN Y. KILPATRICK, and COCHRAN & DAWSON, for appellant.

S. J. CUMMING, *contra.* (No briefs on file.)

STONE, J.—Forniss was planting, and preparing to plant a crop on two adjoining plantations, known as the "Tom Beck plantations." For rent of part of the land, he had prom- ised to pay four bales of cotton to Mrs. Forniss and an hun- dred and sixty dollars to Marshall & Conley. He had also purchased twelve mules of Shields, and had agreed to pay him for them twenty-five bales of the cotton to be grown on

[Shields v. Kimbrough & Purnell,]

the places that year, to be secured by a mortgage on the mules and on the crop. He had also made arrangements with Milhous & Shields, who were commission-merchants, to advance him two thousand dollars in provisions and supplies, to enable him to make the crop, to be secured by crop-lien under the statute, and a mortgage on the crop to be grown, mules, &c. More than half this sum had been advanced by Milhous & Shields to Forniss. Forniss was planting on the share, or "squad system"—he to furnish the land and the mules, while the freedmen were to furnish the labor, and he and they were to divide the crops produced between them. He, Forniss, was to advance provisions to the freedmen, to be repaid; the terms of this contract to be commented on further on. Under this contract, he had advanced to the freedmen, in value, eight hundred or a thousand dollars. At this stage of the adventure, Forniss, on the 17th March, sold out his lease and the personal property to Thigpen, who, to adopt the expression of the witnesses, was to "step into the shoes of Forniss"; to assume all the liabilities enumerated above, and to succeed to all the property rights of Forniss. He, Thigpen, was to assume the liabilities for rent to Mrs. Forniss and to Marshall & Conley, the obligation to pay the twenty-five bales of cotton to Shields, and the two thousand dollars to Milhous & Shields for advances; and was to procure the release of Forniss from his liability therefor to Shields, and to Milhous & Shields. This understanding was carried into effect. Thigpen gave his note to Shields, for the twenty-five bales of cotton, and gave a mortgage to secure its payment, on the mules and the crop to be grown. He also assumed the two thousand dollars for advances, and executed to Milhous & Shields a crop-lien and mortgage, to secure its payment. These were properly recorded April 6th. Forniss delivered up to Thigpen his leasehold interest, mules, farming implements, &c., and delivered to him the accounts against the freedmen for provisions advanced to them; and thereupon Thigpen proceeded to make the crop.

By the terms of the purchase, Thigpen was to pay Forniss three thousand dollars for his interest; five hundred dollars in cash, and twenty-five hundred dollars to be paid first January next afterwards. He paid the five hundred dollars, and on the 9th April, executed a mortgage to Forniss, to secure the payment of the twenty-five hundred dollars. This mortgage, and the contract it is made to secure, show on their face that they are subordinate to all the liabilities stated above. The terms of this mortgage will be explained hereafter. This mortgage was duly recorded in the proper office.

In the process of making the crop, Thigpen obtained ad-

[Shields v. Kimbrough & Purnell.]

vances from Milhous & Shields, beyond the two thousand dollars secured by the crop-lien and mortgage, to an amount near two thousand dollars. They had no mortgage providing for the payment of this excess of advances. Thigpen harvested the corn crop, and divided off to the freedmen their share of it. In October he surrendered the crop in its then condition, together with all the personal property covered by the mortgages, except one mare, to Milhous & Shields, who, through an agent, gathered the cotton crop, and prepared it for market. Among the effects thus turned over to Milhous & Shields, were the accounts against the freedmen for advances made by Forniss, and by Thigpen after his purchase. These, in the aggregate, amounted to some two thousand dollars, only a part of which was realized by Milhous & Shields. The sum realized from the sale of the mortgaged property turned over, including Thigpen's one half of the crop in the division with the freedmen, fell short of the amount necessary to pay the rent liabilities mentioned above, the debt to W. B. Shields for the mules, and the two thousand dollars of advances made by Milhous & Shields, under the crop-lien and mortgage. Supplemented by the sum collected from the freedmen, as after shown, the sum realized exceeded the liabilities above, but was not enough to pay them, and the full amount of the additional advances made by Milhous & Shields, over and above the two thousand dollars. The present complainants, Kimbrough & Purnell, are assignees and owners of the debt and mortgage of Thigpen, given to Forniss as above shown, and the question is presented, does that mortgage convey to Forniss the sum realized from the freedmen's share of the crop, as after shown ?

There is, in the bill and other pleadings, an entire absence of averment of the terms, or of any terms, on which, first Forniss, and then Thigpen, agreed to advance, and did advance, provisions and supplies to the laborers, or how those advances were to be repaid. No reference, in fact, is made to advances; nor is it shown in the bill that any person, other than Thigpen, had or has any interest in the crops to be grown, or that any division of the crops was to take place. The bill charges that said Thigpen, "in order to secure the payment of the said sum of twenty-five hundred dollars, executed a deed of mortgage to the said John J. Forniss, on * * fifteen head of mules, farming implements, one lot of blacksmith tools, and all the cotton, corn, fodder, and everything else to be grown and raised by said Thigpen during the year 1870, on the said two plantations." The bill further charges, "That in the year 1870, a large amount of cotton, corn and fodder, was raised by said Thigpen on said two plan-

tations, amounting to about sixty bales of cotton, one thousand bushels of corn, and five thousand pounds of fodder." The property conveyed by the mortgage of Thigpen to Forniss is therein described as " fifteen head of mules, farming implements, one set of blacksmith tools, and all the cotton, corn and fodder, and every thing else to be raised and grown by him for the present year." In the proof it is shown, as we stated above, that the labor which produced the crops, was performed by freedmen working in squads, and that the crops were to be equally divided between Thigpen and the freedmen, with the exception of one squad, which was to have a larger share.

While the testimony shows that both Forniss and Thigpen advanced supplies to the freedmen, of which they kept accounts, and that the accounts thus kept by Forniss were turned over to Thigpen in the trade, it no where shows that any agreement was made, securing payment for those supplies by a lien on the freedmen's shares of the crop. Thigpen is the only witness who speaks of a contract between Forniss and the freedmen, as to supplies; and he says nothing on the subject of their payment, or security for their payment. All he says on the subject is as follows : " John J. Forniss told me he had a contract signed by and between himself and the laborers on the 'Tom Beck places,' but never delivered that contract to me, nor have I ever seen it; although Forniss promised and agreed to turn the same over to me. But he delivered to me, in place thereof, a contract purporting to be between himself and the laborers on the ' Tom Beck places,' but the same was only signed by John J. Forniss, and not by any of the laborers on said ' Tom Beck places.' In this contract, turned over to me by Forniss, as being the one between himself and the laborers on the ' Tom Beck places,' there was a stipulation that the crops on the said places were to be bound for the advances made to John J. Forniss by W. B. Shields. . . . The accounts due by laborers on the 'Tom Beck places' to John J. Forniss, and which he, the said Forniss, turned over to me after I bought him out, were delivered by me to K. W. Arrington, as agent of Milhous & Shields ; and I also turned over to K. W. Arrington, as agent for Milhous & Shields, the accounts due to myself by laborers on the 'Tom Beck places,' as part payment of my indebtedness to said Milhous & Shields, for advances and supplies made by them to me, for the purpose of running the said ' Tom Beck places.'" These transactions took place long before the enactment of the statute " to regulate the lien of landlords for rent and advances," &c., approved February 9, 1877 (Pamph. Acts, 74), which consti-

tute sections 3474 *et seq.*, Code of 1876. The relation of land-lord and tenant did not exist between Forniss or Thigpen and the laborers on the "Tom Beck plantations."

The foregoing contains every thing this record discloses, bearing on the vital question in this cause. True, in his examination as a witness before the register, in taking the first account, Shields testified that, under the contract by which advances were made to the laborers, "their share of the crops was liable for the supplies. I do not recollect exactly the reading of the contract, and there was no objection on the part of the laborers to let their share of the crop go in that way." Objection and exception were taken to the entire examination of this witness, which were sustained by the court, and the evidence excluded. This leaves the record entirely silent as to the terms on which the advances were received by the laborers, or were to be paid for. Neither the contract of the parties, as shown in this record, nor the relation they sustained to each other, as the law then stood, gave to Thigpen any right to, interest in, or lien on the laborers' shares of the crops, on account of those advances, or brought the accounts within the description of the property conveyed in Thigpen's mortgage to Forniss. They were no part of the "cotton, corn, fodder, or any thing else raised or grown by Thigpen that year." We think, on the evidence before the chancellor, he erred in decreeing to complainants any part of the sums collected from the laborers, or their shares of the crops, for advances made to them.

The chancellor also erred in charging Shields, or Milhous & Shields, with the value of the mare which Thigpen disposed of. That mare is embraced in the mortgage to Milhous & Shields; but is not conveyed in the mortgage to Forniss. There is no evidence that Milhous or Shields ever had possession of this mare, or that she had not been made way with by Thigpen, before Milhous & Shields were authorized to take possession under their mortgage. There is no evidence that Shields or Milhous authorized or connived at the disposition made of her by Thigpen, or that they were guilty of bad faith or negligence in not recovering her or her value. Their duty to Forniss, subsequent mortgagee of a part of the property on which they held a first mortgage, required of them good faith in the enforcement of their mortgage; and if, by fraud, or gross negligence, they permitted a part of the mortgaged property to be destroyed, lost, or removed beyond their reach, and thus left a smaller residuum to be applied to the junior mortgage, equity and good conscience require they should make good such loss.—2 Jones on Mortgages, § 1628. The record before us fails to fix on Milhous or Shields such

fraud, or gross negligence ; and they should have been charged only with the sum actually realized by them.

The farming implements and blacksmith tools are not men- tioned in the mortgages to Shields and Milhous & Shields. They are embraced in the mortgage to Forniss. Kimbrough & Purnell are entitled to these, unless they were purchased with means advanced by Milhous & Shields under the crop- lien. We are not able to detect any other errors in the record.

Reversed and remanded.